IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CASE NO. 5:25-cv-369

| | | |
|---|---|---|
| CLAUDIA SALAZAR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **COMPLAINT** |
| CROSSCOUNTRY MORTGAGE, | ) | **(JURY TRIAL DEMANDED)** |
| LLC, and RALEIGH REALTY INC. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

Now comes Plaintiff Claudia Salazar and files her Complaint against Defendants CrossCountry Mortgage, LLC ("CrossCountry"), and Raleigh Realty, Inc. ("Raleigh Realty" and, collectively with CrossCountry, "Defendants") alleging violations of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 *et seq*.; violations of the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C.G.S. § 75-1.1 *et seq*.; and related claims for civil conspiracy. Plaintiff makes her allegations on information and belief except as to Plaintiff's own actions, of which she has personal knowledge, and as otherwise noted below.

## I.   INTRODUCTION.

1.    This action arises out of, *inter alia*, Defendants' violations of RESPA, which prohibits "kickbacks" and other "unearned fees." *See generally* 12 U.S.C. § 2607.

2.    RESPA was enacted to eliminate "kickbacks or referral fees that <u>tend to increase</u> <u>unnecessarily the costs of certain settlement services</u>." 12 U.S.C. § 2601(b)(2) (emphasis added). Its purpose is to provide consumers "with greater and more timely information on the nature and costs of the settlement process" so they may be "protected from unnecessarily high settlement charges caused by certain abusive practices." *Id*. § 2601(a).

3.    *Settlement services* include "any service provided in connection with a real estate settlement," including those "rendered by a real estate agent[;] the origination of a federally related mortgage loan[;] the handling of processing, and closing or settlement[;]" closing costs on a home purchase; costs associated with the application, processing, underwriting, and funding involved in the origination of a mortgage; and costs of the interest paid on the mortgage by the homebuyer. 12 U.S.C. § 2602(3).[1] These services and costs are governed by RESPA.[2]

4.    In pertinent part, RESPA expressly disallows the acceptance of "any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person." 12 U.S.C. § 2607(a).

---

[1] *See, e.g., Schmitz v. Aegis Mortg. Corp.*, 48 F.Supp.2d 877, 881 (D. Minn. 1999) ("Total compensation to a [mortgage] broker includes direct origination and other fees paid by the borrower, indirect fees, <u>including those that are derived from the interest rate paid by the borrower</u>, or a combination of some or all" (quoting RESPA Statement of Policy 1999–1 re: Lender Payments to Mortgage Brokers, 64 Fed. Reg. 10084 (Mar. 1, 1999)) (emphasis added)).

[2] In RESPA and colloquially, licensed real estate professionals are interchangeably called "agents" and "brokers." For clarity, this Complaint refers to licensed real estate professionals as "<u>agents</u>," and licensed mortgage professionals as "<u>brokers</u>."

5.  Consequently, a settlement-service provider "who agrees to pay a monetary referral fee that is not tied in any respect to a charge paid by a particular consumer," like "a 'retainer' agreement pursuant to which the provider pays a monthly lump sum in exchange for the recipient's agreement to refer any business that comes his way," would violate RESPA § 2607(a). *Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 636 (2012).

6.  Defendants systematically and unlawfully exchanged fees, kickbacks, and other things of value pursuant to an agreement between CrossCountry and Raleigh Realty, with respect to Raleigh Realty's referral of its homebuyer clients to CrossCountry for services related to real estate-settlement services involving federally related mortgage loans.

7.  Specifically, CrossCountry, by and through agreements consummated by its Executive Vice President Charles Shackelford, made recurring improper payments (*i.e.*, "kickbacks" or "unearned fees" (*see* 12 U.S.C. § 2607)) to Raleigh Realty (and other realty companies) disguised as payments for legitimate services. These payments have a tendency to increase settlement costs to consumers, including Plaintiff, unnecessarily.

8.  As a result of Defendants' unlawful agreement and their resulting actions, Plaintiff was unfairly and deceptively coerced into obtaining federally-related mortgage loans from CrossCountry, resulting in concrete injury by the payment of both excessive closing fees and interest rates in excess of what she would have been charged by CrossCountry's competitors in the market.

## II. THE PARTIES.

**9.** Plaintiff Claudia Salazar is a natural person who received and paid for residential realty services from Raleigh Realty for the purchase of real property located at 2809 Titleist Drive, Hillsborough, Orange County, North Carolina (the "Property"). She is a resident of North Carolina and has been so at all times described in this Complaint.

**10.** Plaintiff obtained a mortgage loan from CrossCountry for the purchase of the Property and granted a security interest in the Property to Cross Country via a deed of trust.

**11.** Defendant CrossCountry Mortgage, LLC, is a Delaware limited-liability company with its principal office in Cleveland, Ohio. CrossCountry provides mortgage-lending and -origination services to residential homebuyers across the United States. CrossCountry maintains a branch in Raleigh, North Carolina, led by branch manager Corey Walker and supervised by executive vice president Chuck Shackelford.

**12.** Mr. Shackelford and Mr. Walker are both employees and agents of Defendant CrossCountry and were acting within the course and scope of their employment and agency at all times and with respect to all actions relevant to this action.

**13.** Defendant Raleigh Realty Inc. (*f/k/a* Raleigh Realty, LLC) is a North Carolina corporation and real estate agency specializing in representing residential homebuyers and sellers. Its principal office is located at 2474 Walnut Street, Unit No. 248, in Cary, North Carolina. Its owner and president is Ryan Fitzgerald.

**14.** As Defendant Raleigh Realty's owner and president, Mr. Fitzgerald is an agent of Raleigh Realty and was acting within the course and scope of his agency at all times and with respect to all actions relevant to this action.

### III.    JURISDICTION & VENUE.

**15.** The foregoing allegations are incorporated by reference and realleged herein.

**16.** *Subject-Matter Jurisdiction.* This Court has federal-question jurisdiction pursuant to 28 U.S.C. § 1331; and supplemental jurisdiction exists pursuant to 28 U.S.C. § 1367.

**17.** *Personal Jurisdiction.* This Court has personal jurisdiction over Defendants because both are registered to do business in North Carolina, and both conduct considerable business within North Carolina. Additionally, Plaintiff is a natural person and resident of North Carolina and virtually all the alleged violations giving rise to this action occurred in North Carolina.

**18.** *Venue.* Venue is proper under 28 U.S.C. § 1391. Both Defendants conduct business in this District, and a substantial part of the events giving rise to the claims occurred in this District.

### IV.    FACTUAL ALLEGATIONS.

**19.** The foregoing allegations are incorporated by reference and realleged herein.

### <u>Background on Charles Shackelford</u>

**20.** Mr. Shackelford is an Executive Vice President of CrossCountry.

21. Mr. Shackelford has a team of people who work directly for him in seven branches across the country, including in at least two locations in North Carolina (Raleigh and Wilmington).

22. Mr. Shackelford has been sued individually on at least two separate occasions regarding alleged improprieties at previous banks in which he was a loan officer.

**Background on CrossCountry's Marketing Arrangements.**

23. Mortgage companies use at least two types of marketing arrangements with realty companies: (a) Marketing Services Agreements ("MSAs") and (b) Co-Marketing Agreements.

24. When an MSA is used by a mortgage company, it pays a realty company preset amounts in exchange for marketing services such as displaying the mortgage company's marketing materials on its website and at their physical locations.

25. An MSA is permissible under RESPA only if: (1) "it is structured and implemented consistently as an agreement for the performance of actual marketing services[;]" and (2) "the payments under the MSA are reasonably related to the value of the services performed." Consumer Financial Protection Bureau ("CFPB"), *FAQs – RESPA Section 8: Marketing Services Agreements*, (Oct. 7, 2020) (citing 12 U.S.C. § 2607(c)(2); 12 C.F.R. § 1024.14(g)(1)(iv), (g)(2)).[3]

26. An MSA, like any other agreement or contract, including the below-described Co-Marketing Agreements, is <u>not</u> permissible where the surrounding facts and

---

[3] *See* https://www.consumerfinance.gov/compliance/compliance-resources/mortgage-resources/real-estate-settlement-procedures-act/real-estate-settlement-procedures-act-faqs/#respa-section-8-marketing-services-agreements-msas.

circumstances demonstrate that "the MSA as structured, or the parties' implementation of the MSA—in form or substance[,] including as a matter of course of conduct—involves" any action that "violates the prohibitions [of] RESPA [§§ 2607(a) or (b)]." *Id*. Specifically, agreements involving "payments for referrals are prohibited under [RESPA]." *Id*.

27. Co-Marketing Agreements involve CrossCountry and the realty company jointly sharing the expenses of a joint marketing effort. For example, CrossCountry and the realty company can jointly elect to advertise on websites like Facebook, Zillow, or realtor.com.

28. A Co-Marketing Agreement functions similarly to an MSA and is subject to the same provisions of RESPA, particularly those regarding payments conditioned on referrals. *See Co-Marketing Tips for Following RESPA Rules*, Nat'l Ass'n of Realtors Mag. (Nov. 1, 2018).[4]

29. Settlement service providers can exchange payments "for goods, facilities, or services provided as long as the price is reasonable and not based on referral business," and co-marketing parties must continue to "monitor whether the [agreed-upon] services are actually being performed[;]" in other words, both parties "must [be] able to verify that the work is actually being done" pursuant to their agreement and in line with RESPA. *Id*.

---

[4] *See* https://www.nar.realtor/magazine/live/co-marketing-tips-for-following-respa-rules.

30. CrossCountry and the realty agency enter into a co-marketing arrangement that, at least on the face of a written contract appears to be lawful. In practice, however, and as more fully explained below, the unlawful pay-to-play requirement is common among co-marketing arrangements in which Mr. Shackelford is involved. CrossCountry and the realty agency agree in advance on an amount of payment in return for exclusive referrals to CrossCountry based upon the number of expected referrals. The pay-to-play relationship is established *before* any written contract is executed. The co-marketing arrangement is simply a cover for the pre-existing unlawful agreement.

31. CrossCountry maintained policies for approval of vendors with whom it could use for co-marketing, and it is extremely challenging for new vendors to be approved if they are not already on CrossCountry's approved-vendor list.

32. However, CrossCountry was willing to ignore these policies when necessary; particularly when it involved Mr. Shackelford's team.

33. For example, and more thoroughly alleged below, between February and March 2021, Defendants entered into an unlawful Co-Marketing Agreement under which CrossCountry would pay Raleigh Realty for referrals of Raleigh Realty's homebuyer clients seeking a mortgage, resulting in a "pay-to-play" scheme operating in direct violation of RESPA. *See* 12 U.S.C. § 2601(b).

## Defendants' Unlawful Agreement

**34.** In mid-February 2021, Mr. Fitzgerald and various CrossCountry employees—including Mr. Walker and Mr. Shackelford—began to discuss the terms and expectations for an agreement between the two entities.

**35.** Ultimately it was agreed that CrossCountry would pay $15,000.00 per month to Raleigh Realty. From the beginning it was understood that the Defendants intended to engage in a "pay-to-play" scheme based on referrals with Raleigh Realty—an arrangement far outside the boundaries of RESPA's requirements and CrossCountry's policy. Mr. Shackelford told Mr. Fitzgerald around this time that he expected an average kickback of about $500 for each referral.

**36.** Mr. Fitzgerald understood that Raleigh Realty clients would comply with its directions to use Cross Country as their mortgage provider.

**37.** Before initiating a co-marketing agreement with Raleigh Realty, Mr. Shackelford specifically intended to expedite CrossCountry's process of vetting and approving it, also demonstrating Defendants' intent to finalize an agreement that circumvents RESPA and company policy.

**38.** In early 2021, Defendants agreed that CrossCountry would pay a substantial portion of Raleigh Realty's marketing costs in return for Raleigh Realty's exclusive referral of its homebuyer clients to Cross Country for mortgage origination.

**39.** Specifically, CrossCountry confirmed that the agreed-upon payment of $15,000 would be used to cover at least one-half of Raleigh Realty's monthly payments to Page One Power LLC ("Page One Power"), a digital marketing company

specializing in search engine optimization. *See* Page One Power Contract, attached as <u>Exhibit 1</u>.

40. Mr. Shackelford, as he did in other circumstances, expedited or circumvented the process by which co-marketing vendors were generally approved by CrossCountry's marketing department. For this particular deal, Mr. Shackelford took this proposal straight to top CrossCountry executives. CrossCountry marketing managers who customarily review co-marketing agreements warned the company' executives that the expedited procedure circumvented company policy and violated RESPA. (*Id.*).

41. Nonetheless, Defendants' agreement was executed on April 12, 2021, and was incorporated into the contract[5] with Page One Power via an "Addendum for Vendor Investment Inclusions." (*See* <u>Ex. 1</u>).

42. Per the agreement, each Defendant (represented by Mr. Fitzgerald and Mr. Shackelford, respectively) was to pay $15,000 for Page One Power's services to Raleigh Realty. (*Id.*).

43. In return for CrossCountry's $15,000 contribution, Raleigh Realty was to ostensibly provide various "web marketing services"; however, the reality is that the remuneration was agreed upon in advance and the "marketing services" were simply window-dressing provided for plausible deniability.

---

[5] Raleigh Realty originally contracted with Page One Power in January 2021. (*See* <u>Ex. 1</u>).

44. Thereafter, CrossCountry began making monthly payments under Defendants' agreement, but <u>not</u> as reimbursements sent to Raleigh Realty—instead, CrossCountry received and paid each monthly invoice for $15,000 directly from and to Page One Power.

45. Upon information and belief, Defendants' agreement operated without significant monitoring or oversight—including the monthly documentation proving both parties' adherence to the agreement—from either Defendant for more than one year, also in knowing violation of CrossCountry's co-marketing guidelines.

46. Pursuant to Defendants' agreement, Mr. Fitzgerald continuously instructed and required Raleigh Realty agents to exclusively use CrossCountry to provide the mortgage financing that their clients would inevitably need.

47. Upon information and belief, Defendant Raleigh Realty employs approximately thirty agents who represent and guide homebuyers through the real estate market, evaluating their options, negotiating purchases, and facilitating the closing on the sale of a property.

48. As owner and president of Raleigh Realty, Mr. Fitzgerald possesses and exercises significant control over Raleigh Realty agents' representation of homebuyers. Thus, in furtherance of Defendants' agreement, Raleigh Realty strictly enforced a requirement upon its agents to <u>exclusively</u> refer, compel, and otherwise direct all buyers to CrossCountry for mortgage lending services.

49. Specifically, Mr. Fitzgerald continually told all Raleigh Realty agents that CrossCountry's Corey Walker "needs to be the <u>only</u> lender we [Raleigh Realty] are

recommending;" and any agent who refused to unlawfully induce his or her clients to use CrossCountry was "taking money out of the entire company's pocket" or "my pockets." (*See below* (emphasis added)).



50.     Mr. Fitzgerald threatened that, if he were to "see" any Raleigh Realty agents not exclusively referring clients to CrossCountry by, for example, "recommending [an agent's] friend lenders" to their clients, he would retaliate by depriving those agents of future leads. Because real estate agents work exclusively on commission, Mr. Fitzgerald's repeated threats to withhold leads were tantamount to threats to terminate the agents' livelihoods.

51.     Agents employed by Raleigh Realty were in fact reprimanded, suspended, and otherwise disciplined by Mr. Fitzgerald when they provided their homebuyer clients with mortgage information from other mortgage brokers.

52. Mr. Fitzgerald's words and conduct enacted a requirement upon Raleigh Realty agents to refer all their homebuyer clients to CrossCountry in order to abide by the agreement with CrossCountry and receive the unlawful kickbacks or referral fees.

53. Mr. Shackelford put similar pressure on Raleigh Realty, telling Mr. Fitzgerald that he should not allow Raleigh Realty agents to use any mortgage company other than Cross Country, whether Corey Walker or different Cross Country personnel.

54. In or around May 2022, Mr. Shackelford noticed a downturn in Raleigh Realty's referrals and complained to Mr. Fitzgerald that Raleigh Realty had been failing to meet a minimum expectation of fifteen deals a month and threatening to cut the amount of the monthly $15,000 payment by roughly half.

55. CrossCountry ultimately terminated its agreement with Raleigh Realty after concluding that the numbers of referrals were insufficient for the $15,000 monthly kickback.

56. As demonstrated by the foregoing, Defendants' agreement was not formed, executed, or operated as a proper co-marketing agreement under the applicable law, including RESPA.

57. From the very beginning, Mr. Shackelford and Mr. Fitzgerald—notwithstanding cover stories and pretenses—plainly circumvented CrossCountry's internal policies that were aimed at ensuring compliance with RESPA, and in doing so enacted an agreement that, in practice, operated as a "pay-for-play" scheme based on referrals in direct violation of RESPA.

## PLAINTIFF'S FACTUAL ALLEGATIONS.

58.  Here, Plaintiff bore increased costs for settlements services caused by Defendants' agreement, including but not limited to a higher interest rate, higher closing costs, and higher ongoing payments for the life of the loan.

59.  Had Plaintiff been able to fully consider her options in the mortgage market, she would have paid less for settlement services. Defendants deprived their clients of the benefits of impartial and fair competition in the mortgage market, which ultimately resulted in clients—including Plaintiff—paying amounts in excess of what she would have otherwise paid. For Plaintiff, such deprivation constitutes real harm with adverse effects that will continue for the life of the loan.

60.  Plaintiff engaged Raleigh Realty in connection with her intent to buy a home in or near Hillsborough. Plaintiff was a client of Raleigh Realty from late October 2021 until her closing on February 22, 2022. Plaintiff was represented by Claire Thibault, a Raleigh Realty agent who at the time worked for Raleigh Realty exclusively.

61.  Plaintiff had a relevant credit score of 748 in January 2021 when she applied to Cross Country Mortgage for a mortgage loan. Based on that score, on the terms of the loan, and on the state of mortgage markets on the date of her application, she would have been able to obtain a 30-year fixed-rate loan with an interest rate of 3.625% or lower.

62.  Plaintiff did not know this at the time, because in late 2021 or January Ms. Thibault instructed Plaintiff that "we're working with" CrossCountry Mortgage and that

CrossCountry Mortgage was the best lender for her situation. Plaintiff complied with these instructions and sought a mortgage from CrossCountry exclusively.

63. The representations about CrossCountry being the best option for her mortgage were made at the explicit direction and instruction of Mr. Fitzgerald in furtherance of the kickback scheme described above and plainly had the tendency to increase unnecessarily the costs for Plaintiff's settlement services.

64. In or around January or early February 2022, Plaintiff made an offer to purchase and entered into a Purchase Agreement for the Property. The purchase price was $386,000. The closing date was set for February 22, 2022.

65. CrossCountry originated a 30-year, fixed-rate mortgage for Plaintiff. The amount of the mortgage was $347,400, such that it covered certain closing costs. The interest rate on this mortgage is 3.875% and was fixed approximately one month prior to closing and held through closing.

66. This rate is considerably higher than the rate for which Plaintiff would have qualified had Raleigh Realty not steered her to CrossCountry and strongly discouraged her from other options.

67. If Plaintiff had borrowed $347,400 at a rate of 3.625%, instead of 3.875%, the monthly mortgage payment would have been approximately $50 lower. The difference over the 360-month life of the loan amounts to nearly $20,000.

68. Additionally, Plaintiff was required to pay a "loan origination fee" of $995 to Defendant CrossCountry Mortgage.

69. If Plaintiff had had the opportunity to shop around, she would have been able to borrow from a mortgage lender that charged a lower "loan origination fee" or none at all.

70. Plaintiff would have paid far less in fees and interest if she had had the opportunity to shop around for different mortgages. Having been tied into CrossCountry Mortgage, Plaintiff had no choice but to pay these additional costs. To be clear, Plaintiff would <u>not</u> have paid these excessive amounts but for Defendants' unlawful arrangement.

71. Given the high level of trust that Plaintiff and other consumers place in real estate agents when buying a home, Raleigh Realty compelled Plaintiff to use CrossCountry despite the disadvantageous interest rate over the life of the loan and the increased settlement costs.

72. The words and actions of Raleigh Realty, its owners, and its agents were intended to have and did have the effect of affirmatively inducing Plaintiff's selection of CrossCountry as her mortgage lender. regardless of whether CrossCountry would have been the most choice most beneficial to Plaintiff.

73. The unlawful kickbacks and business referral fees exchanged between Defendants have the tendency to increase – and actually have increased unnecessarily – the costs of settlement services to Plaintiff, causing real harm with adverse effects including higher interest rates, higher closing costs, and higher costs continuing through the life of the loan.

74. Plaintiff closed on the Property on February 22, 2022, on terms described above. To secure the mortgage CrossCountry caused a deed of trust to be recorded on that date with the Orange County Register of Deeds, in Book 6769 at pages 2291 to 2300.

## V. CAUSES OF ACTION.

### FIRST CAUSE OF ACTION
**Violation of Real Estate Settlement Procedures Act ("RESPA"),
12 U.S.C. § 2607, *et seq*.**

75. The foregoing allegations are incorporated by reference and realleged herein.

76. Plaintiff was represented by Raleigh Realty from October 2021 until the closing on February 22, 2022. Her agent was Ms. Thibault.

77. In or around January 2022, Plaintiff made an offer to purchase a home located at 2809 Titleist Drive, Hillsborough, Orange County, North Carolina. The sale price of the home was $386,000. Plaintiff sought a mortgage to fulfill the Purchase Agreement.

78. By and through its agents, Raleigh Realty compelled Plaintiff choose CrossCountry as her mortgage lender, resulting in a higher interest rate and closing costs that Plaintiff would not have paid but for Defendants' unlawful arrangement.

79. By and through its agents, Raleigh Realty directed, impelled, and affirmatively influenced Plaintiff's selection of a real estate settlement service provider: Defendant CrossCountry.

80. Defendants executed and enforced an agreement and understanding that Raleigh Realty's agents would exclusively refer their clients to CrossCountry brokers for

mortgage origination services in exchange for CrossCountry's payment of thousands of dollars per month.

81. From CrossCountry's perspective, the benefit of this arrangement was a stable and regular supply of persons currently in need of a residential loan to purchase a home. From Raleigh Realty's perspective, the benefit of this arrangement was a steady stream of monetary compensation. However, these "benefits" were to CrossCountry and Raleigh Realty alone.

82. Through an unlawful kickback and business referral arrangement with Raleigh Realty (and any other realtors), CrossCountry unfairly competed with other mortgage companies that complied with federal laws prohibiting kickbacks.

83. Moreover, such unfair competition directly and concretely injures consumers, including Plaintiff, because it tends to increase settlement costs, and actually *has* increased settlement costs for Plaintiff and others.

84. Plaintiff has been injured as a direct result of being unlawfully deprived of any meaningful choice in selecting her own mortgage lender. As a result, Plaintiff will continuously be made to overpay tens of thousands of dollars in interest over the life of her mortgage, as well as increased settlement costs.

85. The arrangement and payments were intentional, unlawful, and violate RESPA's express terms.

86. Plaintiff has standing to sue pursuant to RESPA, 12 U.S.C. § 2607(d)(2), because she has been injured by Defendants' arrangement and agreement consisting of

illegal referral payments and kickbacks related to real estate settlement services involving a federally related mortgage loan.

87. Defendants are jointly and severally liable to Plaintiff and in an amount equal to three times the amount of any charge for settlement services paid by her, together with the costs of this action and reasonable attorney fees.

**SECOND CAUSE OF ACTION**
**Violation of the Unfair or Deceptive Trade Practices Act**
**N.C.G.S. § 75-1.1, *et seq.***

88. The foregoing allegations are incorporated by reference and realleged herein.

89. The actions and conduct of Defendants CrossCountry and Raleigh Realty, delineated above, constitute unfair or deceptive acts or practices in or affecting commerce in violation of the UDTPA.

90. Defendants' actions, pattern of conduct, practices, and willful disregard of applicable North Carolina law and the well-being of consumers, including Plaintiff, constitute unfair and/or deceptive acts or practices in violation of the UDTPA.

91. CrossCountry violated the UDTPA by employing unfair, coercive, false, deceptive, and misleading practices, actions, and representations in connection with providing settlement services and mortgage loans to Raleigh Realty homebuyer clients pursuant to the unlawful agreement between Defendants.

92. Plaintiff's claims for unfair and deceptive trade practices against CrossCountry include but are not limited to:

    a. Undertaking actions which CrossCountry knew, or should have known, offend well-established public policy, federal and state law, and federal and state banking law

and were otherwise unlawful, unfair, deceptive, misleading, coercive, and substantially injurious to consumers, including Plaintiff;

**b.** Employing unfair and deceptive measures to collect or attempt to collect amounts, fees, and other expenses relating to providing settlement services and mortgage loans to consumers, including Plaintiff;

**c.** Employing a system, policies, and procedures for procuring clients, providing mortgage lending services, and providing settlement services to Plaintiff and other consumers which, under North Carolina law, are unfair, deceptive, and misleading, and not permitted by public policy;

**d.** Employing and otherwise undertaking the aforementioned procedures, policies, actions, and methods, with the explicit knowledge that such conduct was in violation of applicable North Carolina law, including the SAFE Act;

**e.** Executing and implementing an unlawful agreement with Raleigh Realty to institute unfair, coercive, false, deceptive, and misleading practices, actions, and representations in connection with providing settlement services and mortgage loans to consumers, including Plaintiff, to her detriment;

**f.** Remitting kickback payments to Raleigh Realty in exchange for unfair, coercive, false, deceptive, and misleading practices, actions, and representations in connection with providing real estate agency and brokerage services;

**g.** Knowingly enabling Raleigh Realty's unfair, coercive, false, deceptive, and misleading practices, actions, and representations in connection with providing real estate agency and brokerage services Raleigh Realty's clients, including Plaintiff;

h. Knowingly enabling Raleigh Realty's violations of RESPA and corollary North Carolina laws and regulations designed to protect North Carolina consumers, including Plaintiff; and

i. Proximately causing economic injuries to Plaintiff.

93. Upon information and belief, all CrossCountry's unfair and deceptive conduct, representations, and omissions alleged herein are pursuant to policies, practices, and procedures created, adopted, and implemented for all of its business with Raleigh Realty.

94. Raleigh Realty violated the UDTPA by employing unfair, coercive, false, deceptive, and misleading practices, actions, and representations in connection with providing real estate agency and brokerage services to its homebuyer clients pursuant to the unlawful agreement between Defendants.

95. Plaintiff's claims for unfair and deceptive trade practices against Raleigh Realty include but are not limited to:

a. Undertaking actions which Raleigh Realty knew or should have known to offend well-established public policy, federal and state law, and federal and state banking law and were otherwise unlawful, unfair, deceptive, misleading, coercive, and substantially injurious to consumers such as Plaintiff;

b. Employing unfair and deceptive measures to collect or attempt to collect amounts, fees, and other expenses relating to providing real estate agency and brokerage services to consumers, including Plaintiff;

c. Employing a system, policies, and procedures for assisting homebuyer clients in securing financing for purchasing a home, procuring mortgage services for clients, and providing settlement services to Plaintiff and other consumers which, under North Carolina law, are unfair, deceptive, and misleading, and not permitted by public policy;

d. Employing and otherwise undertaking the aforementioned procedures, policies, actions, and methods, with the explicit knowledge that such conduct was in violation of applicable North Carolina law, including 21 NCAC 58A .0109(i);

e. Executing and implementing an unlawful agreement with CrossCountry to institute unfair, coercive, false, deceptive, and misleading practices, actions, and representations in connection with providing real estate agency and brokerage services to consumers, including Plaintiff, in order to ensure she would acquire a mortgage loan from CrossCountry to her detriment;

f. Accepting kickback payments from CrossCountry in exchange for unfair, coercive, false, deceptive, and misleading practices, actions, and representations in connection with providing real estate agency and brokerage services;

g. Knowingly enabling CrossCountry's unfair, coercive, false, deceptive, and misleading practices, actions, and representations in connection with providing settlement services and mortgage loans to Raleigh Realty's clients, including Plaintiff;

**h.** Knowingly enabling CrossCountry's violations of RESPA and corollary North Carolina laws and regulations designed to protect North Carolina consumers, including Plaintiff; and

**i.** Proximately causing economic injuries to Plaintiff.

96. Upon information and belief, all Raleigh Realty's unfair and deceptive conduct, representations, and omissions alleged herein are pursuant to policies, practices, and procedures created, adopted, and implemented for all of its business with CrossCountry.

97. The forgoing allegations constitute Defendants' unfair or deceptive acts or practices in or affecting commerce in violation of N.C.G.S. § 75-1.1.

98. Defendants' unfair and deceptive acts and practices directly and proximately caused Plaintiff injury in the form of anxiety, stress, anger, frustration, mental anguish, and other pecuniary losses, expenses, costs, and other such damages to be proven at trial.

99. As a direct and proximate result of Defendants' unfair and deceptive acts and practices, Plaintiff is entitled to recover all pecuniary losses, expenses, costs, and damages, including but not limited to the attorneys' fees and expenses incurred in the prosecution of this matter, and other such damages to be proven at trial.

100. As a direct and proximate result of Defendants' unfair and deceptive acts and practices, Plaintiff is entitled to recover treble damages under N.C.G.S. § 75-16, and reasonable attorneys' fees and costs as provided in N.C.G.S. § 75-16.1.

## THIRD CAUSE OF ACTION
### Civil Conspiracy.

101. The foregoing allegations are incorporated by reference and realleged herein.

102. The actions and conduct of Defendants CrossCountry and Raleigh Realty, as described *supra*, constitute a civil conspiracy.

103. Generally, a claim for civil conspiracy merely "associate[s] the defendants together" for liability purposes. *Henry v. Deen*, 310 S.E.2d 326, 334 (N.C. 1984). "The liability of the conspirators is joint and several[:]" each party who enters "into a common purpose or design is equally deemed in law a party to every act…done by any of the others in furtherance of such common design." *Muse v. Morrison*, 66 S.E.2d 783, 785 (N.C. 1951) (cleaned up).

104. To sufficiently state a claim for civil conspiracy, a plaintiff must allege "(1) a conspiracy, (2) wrongful acts done by certain of the alleged conspirators in furtherance of that conspiracy, and (3) injury as a result of that conspiracy." *State ex rel. Cooper v. Ridgeway Brands Mfg., LLC*, 666 S.E.2d 107, 116 (N.C. 2008) (citing *Muse* at 785).

105. Upon information and belief, Defendants intended to form and did form a conspiracy by entering into an unlawful agreement by which Raleigh Realty exclusively referred its buyer clients, including Plaintiff, to CrossCountry in exchange for a monthly monetary payment.

106. Upon information and belief, Defendants shared an express understanding to implement this agreement by purposefully and actively depriving consumers,

including Plaintiff, of her right to participate in the mortgage lending process without the cost-increasing kickbacks and referral fees explicitly prohibited by RESPA.

107.    Upon information and belief, Defendants shared an express understanding to implement this agreement to institute policies and practices to unfairly and deceptively induce consumers, including Plaintiff, to select a mortgage against her best interest in violation of the UDTPA.

108.    Each Defendant repeatedly violated RESPA and corollary state laws and regulations in furtherance of the conspiracy, and as a result Plaintiff suffered damages as identified herein.

## VI.    PRAYER FOR RELIEF.

WHEREFORE, Plaintiff prays for the following relief:

a.    Adjudging that Defendants CrossCountry Mortgage, LLC, and Raleigh Realty, Inc., each violated RESPA, 12 U.S.C. § 2607;

b.    Awarding Plaintiff all damages permitted by RESPA, including treble and statutory damages where applicable;

c.    Trebling the compensatory damages of Plaintiff pursuant to N.C.G.S. § 75-1.1, *et seq.*;

d.    Adjudging that Defendants violated the UDTPA;

e.    Awarding Plaintiff attorneys' fees;

f.    That the costs of this action be taxed to Defendants;

g.    For a trial by jury on all issues so triable; and

**h.** For such other and further relief as the Court deems just and proper.

Respectfully submitted, this the 25th day of June, 2025.

**MAGINNIS HOWARD**

*/s/ Edward H. Maginnis*
EDWARD H. MAGINNIS
N.C. State Bar No. 39317
CHRISTOPHER R. BAGLEY
N.C. State Bar No. 50567
7706 Six Forks Road, Suite 101
Raleigh, North Carolina 27615
Tel:    919-526-0450
Fax:   919-882-8763
emaginnis@carolinalaw.com
cbagley@carolinalaw.com

*Counsel for Plaintiff*
